UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

SK SHIPPING (SINGAPORE) PTE LTD.,

                  Plaintiff,

  - against -

TRANS POWER CO. LTD. and SINOLINK SHIPPING
CO. LTD.,

                  Defendants.

------------------------------------------------------------------X

**07 CV. 10607**

ECF CASE

**VERIFIED COMPLAINT**

Plaintiff, SK SHIPPING (SINGAPORE) PTE LTD. ("Plaintiff"), by and through its

attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the

Defendants, TRANS POWER CO. LTD. ("Trans Power") and SINOLINK SHIPPING CO.

LTD., ("Sinolink") (collectively referred to as "Defendants") alleges, upon information and

belief, as follows:

     1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.  Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

     2.     At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity organized and existing under the laws of Korea.

     3.     Upon information and belief, Defendants were, and still are, foreign corporations,

or other business entities organized and existing under foreign law.

     4.     At all material times, Defendant Trans Power was the disponent Owner of the

motor vessel "VANGUARD" (hereinafter the "Vessel").

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------

SK SHIPPING (SINGAPORE) PTE LTD.,

Plaintiff,

- against -

TRANS POWER CO. LTD. and SINOLINK SHIPPING
CO. LTD.,

Defendants.

--------------------------------------------------------------------X



ECF CASE



## VERIFIED COMPLAINT

Plaintiff, SK SHIPPING (SINGAPORE) PTE LTD. ("Plaintiff"), by and through its

attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the

Defendants, TRANS POWER CO. LTD. ("Trans Power") and SINOLINK SHIPPING CO.

LTD., ("Sinolink") (collectively referred to as "Defendants") alleges, upon information and

belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

2.      At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity organized and existing under the laws of Korea.

3.      Upon information and belief, Defendants were, and still are, foreign corporations,

or other business entities organized and existing under foreign law.

4.      At all material times, Defendant Trans Power was the disponent Owner of the

motor vessel "VANGUARD" (hereinafter the "Vessel").

5.     By a charter party dated February 23, 2006 Plaintiff chartered the Vessel from Defendant Trans Power for the carriage of cargoes.

6.     During the course of the charter, Plaintiff overpaid hire to the amount directed by Defendant Trans Power. *See hire statement annexed hereto as Exhibit "1."*

7.     Particularly, during the course of the charter, the Vessel had to undergo repairs at Mumbai and suffered time lost for Owners' reason at Singapore and was placed "off-hire" for approximately 34.3346 days.

8.     Thus, Plaintiff was entitled to a deduction of the amount of hire owed to Defendant Trans Power under the charter party for the period of off-hire.

9.     Plaintiff was also entitled to a deduction for the bunkers consumed in respect of the off-hire, which is for account of Defendant Trans Power.

10.    Notwithstanding the above, Defendant Trans Power did not take the above deductions into account, and threatened to lien the cargo if amounts said to consist of "repair cost + agency fee + port charge + balance charter hire" in the total sum (as asserted by Defendant Trans Power) of $250,000 was not paid to a certain account nominated by Defendant Trans Power by way of security for the respective claim of the parties under the charter party

11.    In response to the threat of lien, Plaintiff paid to the said account nominated by Defendant Trans Power the sum of $250,000.00 as security for amounts alleged by Defendant to be owed to them under the charter party contract.

12.    Subsequently, Defendant Trans Power has brought a claim against Plaintiff asserting that only a sum of $118,140.94 was owed by way of unpaid hire and bunkers. The said claim is disputed and Plaintiff asserts to the contrary that approximately the sum of $344,000.00 is now immediately due to Plaintiff in respect of hire and bunkers overpaid.

2

13. However, in any case Defendant Trans Power was not entitled to lien the cargo for "repair cost" and/or "agency fee" and/or "port charge" in the (resulting) amount of $131,859.06 under the charter party.

14. Furthermore, without the knowledge or consent of Plaintiff, Defendant Trans Power procured that the whole sum of $250,000 was paid to a third party where it would not stand as security for the disputes between Plaintiff and Defendant Trans Power. Defendant Trans Power thereby converted the same.

15. Thus, in addition to, or alternatively to the claim for over-paid hire, Plaintiff also asserts a claim against Trans Power for wrongful/excessive exercise of lien in the amount of $250,000 or at least, as to $131,859.06 thereof.

16. As a result of Defendant Trans Power's breach of charter party contract and failure to take into account the proper off-hire deductions and/or conversion, Plaintiff has sustained damages and/or is entitled to a refund of sums overpaid under the Charter party in the principal amount of $481,473.02, exclusive of interest, arbitration costs and attorneys' fees.

17. Pursuant to the charter party, all disputes arising thereunder are to be submitted to arbitration in Hong Kong with English Law to apply.

18. Despite due demand, Defendant Trans Power has failed and/or refused to pay the sums due and owing to Plaintiff.

19. Thus, arbitration proceedings have been commenced on Plaintiff's claims.

20. Interest, costs and attorneys' fees are routinely awarded to the prevailing party in proceedings in Hong Kong subject to English and/or Hong Kong Law. As best as can now be estimated, Plaintiff expects to recover the following amounts in the Final Arbitration Award(s) in

3

respect of its claims as above (and excluding for this purpose its estimate of the corresponding

amounts which may be referred to the claims of Defendant Trans Power against the Plaintiff):

| | | |
|---|---|---|
| A. | Principal claim: | $481,473.02 |
| B. | Interest on claims:<br>2.5 years at 7.5%, compounded quarterly | $98,286.88 |
| C. | Estimated attorneys' fees and expenses: | $ 50,000.00 |
| D. | Estimated arbitration costs: | $ 25,000.00 |
| Total | | **$654,759.90** |

21.    Upon information and belief, Defendant Trans Power uses Sinolink as a

"paying/receiving agent" or "pass through" entity such that it can insulate itself from creditors

relating to its contracts.

22.    It is not general practice in the maritime community, nor any where else, for

independent companies to make or receive large payments on behalf of other independent

companies.

23.    Payments sent or received on behalf of another independent company are

suggestive of a relationship that is not "arms length."

24.    Upon information and belief, Sinolink receives payments on Defendant Trans

Power's behalf where Sinolink has absolutely no contractual relationship to Defendant Trans

Power's creditors.

25.    Upon information and belief, Plaintiff was instructed that all hire payments under

the above charter party were to be made to Sinolink's account.

26.    Pursuant to the instructions, Plaintiff sent nine (9) payments to Sinolink for hire

related the Trans Power charter.

4

26. In addition, upon information and belief, Defendant Trans Power instructs other charterers to pay hire to Sinolink where Sinolink has no contractual obligation to Trans Power's creditors. *See Clause 30 of Exhibit "1" to Verified Complaint in Trans Power Ltd. v. African Maritime Carriers Ltd., Docket #05 Civ. 6436 (JSR) annexed hereto as Exhibit "2."*

27. In the further alternative, Defendants are partners and/or joint venturers.

28. In the further alternative, Defendants are affiliated companies such that Sinolink is now, or will soon be, holding assets belonging to Trans Power, or vice versa.

29. The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendants.

30. The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant(s) held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendants, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A. That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

5

B.       That the Court retain jurisdiction to compel the Defendant(s) to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.       That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendant(s), in the amount **$654,759.90** calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Verified Complaint;

D.       That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court

E.       That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.       That this Court award Plaintiff its attorneys' fees and costs of this action; and

G.       That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

6

Dated: November 27, 2007
Southport, CT

The Plaintiff,
SK SHIPPING (SINGAPORE) PTE LTD.

By: _Charles E. Murphy_

Charles E. Murphy (CM 2125)
Nancy R. Peterson (NP 2871)
Patrick F. Lennon (2162)
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
nrp@lenmur.com
pfl@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut )
                     )      ss.:    Town of Southport
County of Fairfield  )

1.     My name is Charles E. Murphy.

2.     I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.     I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.     I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.     The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.     The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.     I am authorized to make this Verification on behalf of the Plaintiff.

Dated:     November 27, 2007
           Southport, CT

Charles E. Murphy

8

# Exhibit 1

## SK SHIPPING ( SINGAPORE ) PTE LTD

1 Zallou Thur 450-22 Tay-Abc Place Singapore 048419
Berton Road 1514644@Skshipping.com, terms@skshippinge.com
TLX : XXXX/SKYKLZNY

Tel : (65) 6227-6506
Fax : (65) 6274-6466

| TO : | Sinotrek Shipping | | Date : | 15-Oct-07 |
| CO : | Howe Robinson HK | | | |
| Attn: | Mr Tim Tang / Andrea | | | |
| FM : | SK Shipping (S'Pte Ltd | | | |
| RE : MV. | Vanguard DIP dated 23rd Feb 2006 | | | |

*AS PER OUR FINAL HIRE STATEMENT FOR SAID VESSEL(S):*

| Hire From | 06-3-3 8-42 | BOD GNT | | |
| To | 06-8-2 14:18 | SID OUT | APS Bunyra | |
| Total duration | 152.264567 | Days | | |
| Perkings | 0.00% | | Daily Nine | 3000 |
| kid cross | 2.50% | | | |
| IFO Price | 310.00/T | | MDO Price | 50.00/MT |

| | Time compounds during at Ranha 10 days Manhul docts to regula at Mumbai | | | |
| OFF HIRE | 8th Jan 1400 - 9th ful 1612, 16.0916 days | | | |
| | OFF-hire for rest that taking of FW at 3 grs 0.24306 days | | 34.29166 DAYS | |
| 1. Hire due to Owners | | | DR | CR |
| | 10000/DY | | | 1,02,175.46 |
| | | 2.5% Comm | 28,564.39 | |
| | | | | |
| 2. BOD | IFO | 454.720MT | | 140,657.00 |
| | MDO | 90.32/MT | | 47,105.80 |
| 3 BOR | IFO | 452.763MT | 140,353.90 | |
| | MDO | 80.610/MT | 47,005.90 | |
| 4. ILOHC | | | | 4,000.00 |
| 5. CVE | | USD/1,100 | | 4,327.35 |
| 6. Intermediate Hold Cleaning  Luqsk - Mauritius | | | | 2,000.00 |
| | Sur - Mujusa | | | 2,000.00 |
| | Vardra - IFK | | | 2,500.00 |
| | Shuziba - Bahrain | | | 4,500.00 |
| | Mina Shau - Hastra | | | 3,000.00 |
| | New Mangalore - Hanting | | | 2,500.00 |
| 7. Agreed compensation for extensive loading - lumpsum | | | | 20,000.00 |
| 8. AP for Lugsk | | | | 1,975.50 |
| 9. Ows expenses  Lugsk ( watch man and MdA(ex) Prop. 12,300 ) | | | 737,725 | |
| 10. Ows expense  PW 200mt (RS 26656 x 0.03528) | | | 1,183.74 | |
| 11. Ows expenses at New Mangalore (Couriar) | | | 34.73 | |
| 12. Ows expenses at Singapore (FW) | | | 1,331.64 | |
| 13. Ows expenses at Mauravia (Stores, cash, medical, FW) | | | 1,247.44 | |
| 14. Owner expenses at Shuziba | | | 343.17 | |
| 15. Owner expenses at Bahrain | | | 1,580.86 | |
| + 2.5% for all owner expenses | | | 155.86 | |
| 16. Jahil entire survey fee ( BOD / 3 ) | | | - | 300.00 |
| 17. Add bunker con during vsl waiting repairs at Mumbai  54.0916 x MDO 1.0mt x 520 | | | 47.73/mt | |
| 18. Add bunker con during vsl waiting repairs at Mumbai 34.0916 x IFO 1.0mt x 310 | | | 30,570.60 | |
| 19. Add bunker con during for FW: 0.24306 x MDO 1.0mt x 520 | | | 178.50 | |
| 20. Add bunker con during for FW: 0.24306 x IFO 1.0mt x 310 | | | 78.35 | |
| 21. Credit steaming time from Hastra - Mumbai 1336hr – 0.45 days x US$3600.00 | | | | 4,000.00 |
| 22. Less bunkers 2g cons Hastra - Mumbai 0.45 days x 32.5mt x US$310 | | | | 5,114.75 |
| 23. Less bunkers mdo cons Hastra - Mumbai 0.45 days x 1.0 mt x US$520 | | | | 234.00 |
| 24. Cash Advance to Pastro No-8 Do all Owx request for Lika On Cargo by Head Ows | | | 200,000.00 | |
| 25. Less paid | 01st Mar 2006 | | 310,051.30 | |
| | 10th Mar 2006 | | 431,062.40 | |
| | 03rd Apr 2006 | | 124,573.40 | |
| | 17th Apr 2006 | | 522,573.40 | |
| | 72nd May 2006 | | 102,850.37 | |
| | 15th May 2006 | | 591,364.23 | |
| | 32th June 2006 | | 124,750.74 | |
| | 13th July 2006 | | 124,573.60 | |
| | 24th July 2006 | | 52,242.83 | |
| | | | 1,783,337.31 | 1,302,134.59 |
| AMT DUE TO CHRTRS | | BALANCE | | 481,401.61 |
| | | TOTAL | 1,783,437.61 | 1,783,437.61 |

Pls kindly remit to the bank details :

STANDARD CHARTERED BANK, NEW YORK
(SWIFT ADDRESS: SCBLUS33)
STANDARD CHARTERED BANK, SINGAPORE
(SWIFT ADDRESS: SCBLSGSG)
IN FAVOR OF SK SHIPPING (S) PTE LTD
ACCOUNT NO: 0C0105308
REF: MV VANGUARD

H-OK
MANAGING DIRECTOR

# Exhibit 2

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  This Charter Party, made and concluded in London........................................*19th* day of *February* ............... 19*2005*
2  Between **Trans Power Ltd, Xiamen**...................................................................................................................................
3  Owners of the good **Greek flag**.......... Steamship/Motorship *"SPARTIA"* – built 2000............ *of Description of Vessel – see Clause 29*
4  of............................. tons gross register, and........................ tons net register, having engines of......................................... indicated horse power
5  and with full machinery and equipment in a thoroughly efficient state, and classed.........................................................
6  .................................................of about.................cubic feet bale capacity, and of about.........................tons of 2240 lbs.
7  deadweight capacity (cargo and bunkers, including fresh water and stores and constant, and such as can hold persons of ship's deadweight capacity,
8  allowing a minimum of fifty tons) on a draft of............................feet...............inches on..............................Summer Freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about......................................................tons of fuel, and capable of steaming, fully laden, under good weather
10  conditions about ..................................knots on a consumption of about.................................tons of best Welsh coal – best grade fuel oil – best grade Diesel oil,
11  now *trading* ..................................................................................................................................................................
12  .............................................and *African Maritime Carriers*...................... Charterers of the City of *Geneva*................................

13  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  *about a Timecharter period of minimum 11 to maximum 13 months trading, always afloat except not always afloat but*
15  *safely aground as per Clauses 6, 29 and 38, always accessible, always within Institute Warranty Limits. Charterers' option to*
15  *break Institute Warranty Limits on Great Circle route where Master to have final discretion which not to be unreasonably*
15  *withheld* within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter *except to A.R.T.*, but Charterers remaining responsible for
17  the fulfilment of this Charter Party. *Acceptance of the vessel shall not constitute any waiver of Charterers' rights under this Charter*
17  *Party.*
18  Vessel to be placed at the disposal of the Charterers, at on dropping last outward sea pilot Pioo, Singapore – *South Japan range, intention*
19  *Kwangyang, Korea* any time day or night Sundays and holidays included. ...............................................................................
20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 9, as
21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 6. Vessel on her delivery to be
22  ready to receive cargo with clean-swept holds *to independent surveyor's satisfaction* and tight, staunch, strong and in every way fitted for the service,
23  having water ballast, winches and
24  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25  dise, including petroleum or its products, in proper containers excluding *See Clause 59*....................................................
26  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27  all necessary fittings and other requirements to be for account of Charterers) in such lawful trades, between safe port and/or ports in British North
28  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29  Mexico, and/or South America...........................................................................................................and/or Europe
30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31  October 31st and May 12th, Hudson Bay and 48 annule ports, also excluding, when out of season, White Sea, Black Sea, and the Baltic,
32  *See Clauses 55 and 58*..................................................................................................................................................
33  ........................................................................................................................................................................................
34  ........................................................................................................................................................................................
35  as the Charterers or their Agents shall direct, on the following conditions:

36  1.  That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew *and all other charges*
36  *related to the Master, Officers and crew;* shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water *also for garbage actually removed,*
37  *lubricating oil* and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

39  2.  That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *customary Pilotages, Agencies,*
39  *SKAW pilotage to be minimum "GEDSER SKAGEN LADEN, ELSINORE DROGDEN in ballast", DARDANELLES pilotage,*
39  *Commissions,*
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except that; before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  Illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been re-charter for a continuous period
44  of six months or more. *If crew have to be taken ashore due to fumigation of cargo then the cost of transportation and*
44  *accommodation to be for Charterers' account, however, all expenses for any fumigation due to vessel and/or crew matters,*
44  *always Owners' account.*
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.
48  3.  That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49  board the vessel at the current prices in the respective ports; the vessel to be delivered with not less than ...................... tons and not more than
50  .....................tons and to be re-delivered with not less than .......................tons and not more than .......................tons *See Clause 43.*



WORKING COPY

51 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$39,000 *(Thirty Nine Thousand Dollars)*
52 *daily including overtime - see Clause 30* United States Currency per ton on vessels total deadweight carrying capacity, including bunkers and
53 stores, etc. ~~cwtailes freeboard, per Calendar Month~~ commencing on and from the day of her delivery, as aforesaid, and at
54 and after the same rate for any part of a month *day*; hire to continue until the *time* hour of the day of her re-delivery in like good order and condition, ordinary
55 wear and tear excepted, to the Owners (unless lost) as *on dropping last outward sea pilot one safe port in Charterers' option SKAW/CAPE*
56 *PASSERO Range including UK, excluding Black Sea or Mediterranian or in Charterers' option one safe port in Charterers'*
56 *option PASSERO Range including UK, excluding Black Sea or Mediterranian or in Charterers' option one safe port in*
56 *Charterers' option ADEN/MUSCAT Range or in Charterers' option one safe port in Charterers' option Boston - Recalada*
56 *Range or in Charterers' option one safe port in Charterers' option SINGAPORE/JAPAN Range any time day or night Sundays*
56 *and holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than 25 days
57 notice of vessels expected date of re-delivery, and probable port *and 15 days definite notice of vessel's redelivery. Charterers are to keep*
57 *Owners fully informed of vessel's itinary to redelivery.*

58 5. Payment of said hire to be made in New York in cash in United States Currency, semi-monthly *fifteen days* in advance, and for the last half-month
58 *fifteen days* or
59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise falling the punctual and regular payment of the
61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from *vessel's delivery.* 7 a.m. on the working day
63 following, that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m. but if required by Charterers, they
64 to have the privilege of using vessel at once, such time used to count as hire.
65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67 of such advances.

68 6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may
69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *as per Clauses 39 and 58* where it is customary for similar
69 size vessels to safely
70 lie aground.

71 7. That the whole reach of the Vessel's Hold, Decks, *(no deck cargo allowed)* and usual places of loading (not more than she can reasonably stow
71 and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow. Charterers
74 paying Owners.....................per day per passenger for accommodation and meals. However, it is agreed that in no way lines or extra expenses are
75 incurred is the consequences of the carriage of passengers, Charterers are to bear such risk and expenses.

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew, *equipment* and
77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78 agency; and Charterers are to load, stow, *spout* and trim, *tally and discharge* the cargo at their expense under the supervision of the Captain, who is to sign
78 *or is to authorise Charterers to sign* Bills of Lading for
79 cargo as presented, in conformity with Mate's or *and* Tally Clerk's receipts.

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84 rate of US$ 10.00 *(Ten Dollars)* $4.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to
84 victual Tally
85 Clerks, Stevedore's Foreman, etc.; Charterers paying at the current rate per meal, for all such victualling. *See Clause 74. Master will not receive*
85 *orders from Charterers or their agents to victual stevedores or other persons related with loading operations.*

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87 Captain shall keep a full and correct Log *in English* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89 sumption of fuel.
90 12. That the Captain shall use diligence in caring for the ventilation of the cargo.
91 13. That the Charterers shall have the option of continuing this charter for a further period of...............................
92 ..............................................................................................................................................................................................................
93 on giving written notice thereof to the Owners at their Agents..............................days previous to the expiration of the first named term, at any deck and option
94 14. That if required by Charterers, time not to commence before *20 March 2005*.................................................................. and should vessel
95 not have *been delivered* given written notice of readiness on or before *20 April 2005*.......................................... but not later than 4 p.m. Charterers or
96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Owners will declare 15 days laycan*
96 *spread together with delivery port latest by COB London 7 March 2005. Thereafter Owners will declare 10 days laycan spread*
96 *latest by 10 days prior delivery.*

97 15. That in the event of the loss of time from deficiency of men, *sickness, strike, accident or default of Master, Officers or crew or*
97 *deficiency* of stores, fire, breakdown or damages to hull, machinery or equipment,
98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99 preventing the full *use* working of the vessel *to the Charterers*, the payment of hire *and overtime* shall cease for the time thereby lost; and *all expenses*
99 *incurred including bunkers consumed during period of suspended hire shall be for Owners' account and if* upon the voyage the speed
99 be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to ~~three~~ *two* persons at ~~New York,~~ *London as per BIMCO/L.M.A.A. Arbitration Clause 1998 and English law to apply,* one to be appointed by each of the parties hereto, and *an umpire* ~~the third~~ by the two so chosen; their decision or that ~~of any two of them,~~ *the umpire* shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men, *conversant with shipping matters.*

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~ York-Antwerp Rules *1974 as amended 1990 and any amendments further thereto. In case of property Owners and Charterers to share equally return of salvage.* ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.~~

~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.~~

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.

21. *See Clause 61.* ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

*See Clause 29* ______________________________

______________________________

22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The Charterers to have the use of any gear on board the vessel. *Owners agree to supply sufficient electric light for night work as on board.*

23. Vessel to work night and day, if required by Charterers, ~~and all winches to be at Charterers' disposal during loading and discharging; steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles.~~ If the rules of the port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. ~~In the event of a disabled winch or winches, or insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned thereby.~~

24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels, etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:~~

~~U. S. A. Clause Paramount~~

~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

~~Both-to-Blame Collision Clause~~

~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.~~

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging.

170    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171    navigation of the vessel, *her seaworthiness, maintenance, acts of pilots and tugboats*, insurance, crew, and all other matters, same as when trading
171    for their own account.
172    27. A commission of 2 1/2 per cent is payable by the Vessel and Owners to *1.25% payable to Howa Robinson, for division*
173    ────────────────────────────────────────────────────────────────────────────────────────────────────────
174    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175    28. An address commission of 2 1/2 *3.75* per cent payable to *Charterers*......................................... on the hire earned and paid under this Charter.

Clauses ..*29*.. to *100*.. inclusive as attached hereto, are deemed to be fully incorporated in this charter party.


Owners                                    Charterers

    ...

────────────────────────────────────────        ────────────────────────────────────────────────────────


This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

M.V. SPARTIA
CHARTER PARTY DATED 19TH FEBRUARY 2005
ADDITIONAL CLAUSES

Clause 29    Vessel's Description

Vessel: M .V. "SPARTIA"
Greek Flag: Built 2000 Hitachi
Length overall 225 metres beam 32.2
75,115 metric tons deadweight all told on 13.84 metres Sea Salt Water
7 holds/hatches:
Hatch. dimensions : No 1. : 16.34 x 12.96
Nos 2-7 : 17.20 x 14.58
Main hold capacity : 89,422.5 cubic metres. (3,157,928 cubic feet)

| No.1 | 11,488.6 | CBM |
| No.2 | 13,092.5 | , |
| No.3 | 13,022.4 | , |
| No.4 | 13,030.9 | , |
| No.5 | 13,099.7 | , |
| No.6 | 13,085.5 | , |
| No.7 | 12,602.9 | , |

Speed/Consumption
Either: About 14.00 knots on 33.50 metric tons for 380 CST laden/ 28 metric tons
ballast,
Or: About 14.50 knots on 37.50 metric tons 380 CST laden/ 31 metric tons ballast
Basis Beaufort F4 and Douglas Sea State 3- it is understood that, notwithstanding
anything to the contrary herein, no warranty applies to conditions exceeding Beaufort
4 and Douglas 3. No additional consumption of Fuel Oil or Marine Diesel Oil at sea
in port consumption 2.2 working / 1.8 metric tons idle Fuel Oil 380 CST per 24 hours.
Vessel consumes Marine Diesel Oil when manoeuvring pilot to pilot and in narrow
waters constants 350 metric tons excluding fresh water TPC : 67.32 at sea salt water
scantling draft deadweight all told on Panama draft 39'6" TFW : - 61,200 metric tons.
Wlt hatchcover no1) 19.43, no 7) 15.20 light / no1) 16.15 no7) 13.66 metres
Heavy Pandi :UK Club classed :100ai Lloyds holds 2/4/6may be empty
(-alternate hold loading to be approved by master, depending on Voyage ).
Winter "      :73176 metric tons draft:13.55 metres
Tropical "     :77057 metric tons draft:14.129 metres
International gross tonnage: 39783    net :25329
Suez net :37417,67  Panama net:32890
All details abouts, given in good faith

++

=Owners warrant foll:
.Vessel is selftrimming Single Deck Bulkcarrier (and was originally constructed as a
Bulkcarrier) with engine/bridge and accommodation
Aft. Yes
.Vessel has no cargo battens and vessel has no horizontal corregations: Rvtg
.Vessel does not have a centerline bulkhead/beam or any other obstructions.
.Vessel capable of ballasting/deballasting without interruption to the continuous
loading/discharge operation - checking/reverting
.Vessel classed Lloyds highest or equivalent and class shall be maintained during the
entire currency of Charter Party.

HOWE ROBINSON                    .    1

WORKING
COPY

## M.V. SPARTIA
## CHARTER PARTY DATED 19TH FEBRUARY 2005
## ADDITIONAL CLAUSES

**Clause 29 continued**

.Vessel has clear unobstructed main holds: Yes
.Vessel is steel floored throughout: Yes .
.Vessel shall not change ownership or class or flag without Charterers' written
consent which shall not be unreasonably withheld.: Per Charter Party
.Vessel's Hull and Machinery Insurance shall be fully maintained and
will not be changed.
.Vessel to remain fully Pandi covered during the entire currency of the
Charter.
.Vessel's all hatches are water-tight and/to remain so throughout the
Entire Voyage.: Per Charter Party
.Vessel is suitable in all respects for the loading, safe carriage and
discharge of intended cargo(es).

**Clause 30**

Charterers to pay first hire together with bunkers on delivery value within 3 (three)
banking days after confirmation of vessel's delivery and thereafter every 15 (fifteen)
days in advance.

Bank:        Wachovia Bank N.A. New York, USA
Chips ABA:   0509
PNBPUS3NNYC, for credit Xiamen International Bank, Xiamen
International Plaza
8-10 Lu Jiang Road
Xiamen 361001 China
Swift Code: IBXHCNBA
In favour of 'Sinolink Shipping Company Ltd
USD account no: 9830 313000719

Please make reference to Vessel and Charter Party date in payment details.

Hire to be calculated basis GMT.

Charterers are entitled to deduct from last sufficient hire payment of Owners'
estimated disbursement if Owners fail to nominate their protective agent but
maximum US$1,000 (One Thousand Dollars) per port of call but limited to those
visited in the last 3 months as well as the value of estimated quantity bunkers on
redelivery to be substantiated by vouchers with finalisation of accounts. It is
understood that Charterers may deduct such estimated disbursements continuously
throughout the Charter Party, provided that Charterers supply Owners with original
supporting vouchers.

After any deduction for redelivery bunkers, if the redelivery date becomes later than
at the time of such deduction, and hire becomes outstanding, Charterers shall
immediately pay sufficient hire to comply with the Charter Party, i.e. 15 days in
advance, or up to the new redelivery date.

**HOWE ROBINSON**                    2

M.V. SPARTIA
CHARTER PARTY DATED 19TH FEBRUARY 2005
ADDITIONAL CLAUSES

### Clause 31

Referring to Line 60 and 61, where there is any failure to make "punctual and regular payment", due to oversight or negligence or error or omission of Charterers' employees, bunkers or agents, Owners shall notify Charterers in writing whereupon Charterers will have two banking days to rectify the failure, where so rectified the payment shall stand as punctual and regular payment.

### Clause 32

Charterers to have the right to withhold from Charter hire during the period of this Charter such amount due to off-hire.

Owners will appoint their own agents when reasonable amount of husbanding work is involved, where only minor and normal Owners' matters are to be attended, Owners have the privilege of availing Charterers' agent's services without agency fees and Owners to reimburse actual expenses.

### Clause 33

In the event of the vessel being boycotted by I.T.F., delayed or rendered inoperative by strikes, labour stoppages, or by any other difficulties due to vessel's flag, Ownership, crew, terms of employment of officers or crew, or any other vessel under the same Ownership, operation or control. All times lost is to be considered as off-hire, and expenses and liabilities incurred thereby to be for Owners' account.

### Clause 34

Should the vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers' use and all extra expenses and consequential actual losses which proved by Charterers shall be for Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their agents, or by reason of cargo carried.

### Clause 35

Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account if caused by Charterers or by Charterers' servants, and to be for Owners' account if caused by Master, Officers, crew or Owners' servant.

### Clause 36

Vessel to give Charterers/agents on fixing and 10/7/5/3/2/1 day(s) delivery notices.

Owners to send Charterers vessel's deadweight all told Scale/General Plan when requested.

HOWE ROBINSON                                    3

M.V. SPARTIA
CHARTER PARTY DATED 19TH FEBRUARY 2005
ADDITIONAL CLAUSES

**Clause 37**

Any delays, expense or directly related loss by reason of non-compliance with
regulations, lack of proper documentation or equipment as per Clause 29 and 46 to 50
or on any breach of said Clause to be for Owners' account.

**Clause 38**

Charterers to pay hire as agreed.

**Clause 39**

If stevedores, longshoremen or other workmen are not permitted to work due to
failure of the Owners to comply with Clause 50 or because of lack of said certificate,
any time so lost shall be treated as off-hire, and all extra expenses incurred, directly
resulting from such failure, shall be for Owners' account.

**Clause 40**

Should the vessel deviate or put back during a voyage, contrary to the orders or
directions of the Charterers, the hire is to be suspended from the time of her deviating
or putting back until she is again in the same or equidistant position from the
destination and the voyage resumed therefrom. All fuel used by the vessel while off-
hire to be for Owners' account.

**Clause 41**

If for any reason whatsoever the vessel will be off-hire or is reasonably estimated to
be off-hire for 30 (thirty) days, Charterers have the option to cancel the balance of this
Charter Party provided no cargo on board.

This clause not applicable in this case of scheduled or emergency dry docking (see
clause 61).

**Clause 42**

Hire as specified in Line 51 to include among other operations usually performed by
the crew unless prohibited by shore regulations such as:

- Opening and closing of hatches
- Watchmen at holds for supervision of loading and discharging
- Docking/undocking/shifting/ballasting and bunkering
- Shape up hatches/holds as much as possible prior to arrival at loading and/or
  discharging port/dock/anchorage, so that loading and/or discharging
  operations can commence immediately.

Watchmen on cargo to be for Charterers' account, gangway watchmen on vessel to be
for Owners' account, but where compulsory to employ and pay gangway watchmen
from shore, the expenses to be for Charterers' account.

HOWE ROBINSON                                   4

M.V. SPARTIA
CHARTER PARTY DATED 19TH FEBRUARY 2005
ADDITIONAL CLAUSES

### Clause 43

Bunkers on delivery to be about 1,320 metric tons intermediate fuel oil and about 57 metric tons marine diesel oil.

Bunkers on redelivery to be about same quantity as on delivery.

Prices both ends US$180 (One Hundred and Eighty Dollars) per metric ton for intermediate fuel oil and US$365 (Three Hundred and Sixty Five Dollars) per metric ton for marine diesel oil.

### Clause 44

Charterers to have the option to bunker vessel prior to delivery, provided that the operation does not interfere with Owners' normal operations. Owners to have the option of bunkering prior to redelivery.

### Clause 45

Owners warrant that vessel is eligible and equipped to bunker in the U.S.A., its territories and possessions and in all countries to which vessel is allowed to trade under this Charter.

### Certificates -- Warranties Clauses

### Clause 46

The Owners are to provide and keep on board valid deratisation certificates throughout the Charter period; destination shall always be for Owners' account.

### Clause 47

Throughout the period of the Charter, vessel to be in possession of all necessary valid equipment and certificates to comply with safety and health regulations, national and international regulations, and all current requirements at all ports of call, Panama and Suez Canal incurred.

### Clause 48

For the carriage of grain in bulk, vessel to have on board throughout this Charter period valid documents and certificates issued by the classification society and/or national authority and accepted by NCB Ministry of Transport on the basis of the SOLAS 1974 Regulations and latest amendments thereto.

# M.V. SPARTIA
## CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

**Clause 49**

Vessel to be fit for grab/vacuum discharge and no cargo to be loaded in places inaccessible to grabs or in deep tanks. Charterers to have the privilege of using bulldozers with rubber wheels where available in vessel's holds. However, unit weight of bulldozers will not exceed vessel's tank top strength.

**Clause 50**

The Owners undertake that all vessel's equipment shall conform with regulations in all ports visited by the vessel, and that the vessel is at all times in possession of valid certificates to comply with such regulations.

**Clause 51**

Owners warrant that the vessel has not traded Israel and is not blacklisted by Arab countries.

**Insurance Clause**

**Clause 52**

Owners shall maintain and carry on board a valid P & I Entry Certificate containing the oil pollution limitation of cover clause, Owners by production of a certificate of insurance or otherwise shall satisfy the requirements of (A) Section 311 (P) of the United States Federal Pollution Control Act, as amended through 1978 (33 U.S. Code Section 1 1321 (P), (B) Article VII of the International Convention of Civil Liability for Oil Pollution Damage 1969 as far as applicable, save as aforesaid, Owners shall not be required by Charterers to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel to lawfully enter, remain in or leave any port, place, territorial or contiguous waters or any country, state or territory, in performance of this Charter Party.

**Clause 53**

Deleted

**Clause 54**

Vessel to be self trimming single deck bulk carrier and fully P & I covered.

**Clause 55**

In the event of outbreak of war between any of the following countries: United States of America, the country of vessel's flag, Union of Soviet Socialist Republics, Communist China, United Kingdom, Japan, France, Germany, Greece, both Charterers and Owners have the option of cancelling this Charter Party.

**HOWE ROBINSON**

6

## M.V. SPARTIA
### CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

**Clause 55 continued**

It is understood that war means direct war between these Nations and does not include local hostilities or civil war where any of the above countries support opposing sides. Owners and Charterers shall not unreasonably take advantage of this clause in case of limited local conflict.

**Clause 56**

The basic war risk insurance premium on the vessel's hull and machinery value and present war bonus to the Master, Officers and Crew are for Owners' account, but any increase of same due to vessel's trading into an excluded area to be for Charterers' account.

**Clause 57**

General Average/Arbitration in London, as per BIMCO/LMAA Arbitration Clause 1998 and English Law to apply.

This Charter is subject to the New Jason Clause, New Both-to-Blame Collision Clause, Conwartime 1993 Clause as attached, which are to be incorporated in all Bill(s) of Lading issued under this Charter. Above clauses as attached.

All Bills of Lading issued under this Charter will incorporate the General Paramount Clause as attached.

**Exclusion Clause**

**Clause 58    Trading Exclusions**

Always afloat, always within Institute Warranty Limits, Cambodia, North Korea, Cuba, Israel, Iraq, Somalia, Eritrea, Yemen, Algeria, Liberia, Sierra Leone, Nigeria, Syria, Angola, Libya, Lebanon, former Yugoslavia (Serbia Montenegro), Siberian Peninsular ports, Orinoco and Amazon Rivers, Angola including Cabinda, Congo (Zaire), Sri Lanka.

Iran permitted under current war risk situation, if risk increases, Owners to have liberty to withdraw full or partial calling rights.

Port LATTA permitted with any additional cost for extra moorings fittings to be for Charterers' account including any lost time. This wording to apply also to port Drummond, and any port requiring an unusual mooring fittings/additional ropes/wires.

California ballast water fees to be for Charterers' account. No fertilisers to be discharged in Australia.

Vessel permitted to trade NAABSA in South America as follows:

**HOWE ROBINSON**                              7

**M.V. SPARTIA**
**CHARTER PARTY DATED 19TH FEBRUARY 2005**
**ADDITIONAL CLAUSES**

**Clause 58 continued**

Trading River Plate and Brazil south of Tubrao where customary for similar sized vessels, (NAABSA is not permitted at Necochea) when trading River Plate, Charterers and their agents to give Master/Owners full cooperation to ensure that the vessel is loaded to correct draft as recommended by the pilots association to safely transit the river system.

Charterers only to have right to break Institute Warranty Limits only for great circle route (but to be at Master's final discretion during winter season).

**Clause 59     Cargo Exclusions**

All cargoes to be loaded in accordance with IMO regulations.  Charterers to advise IMO number of any intended cargo, arms, ammunition, asphalt and pitch in bulk, explosives, acids, all dangerous and injurious inflammable cargoes, radio active products, nuclear fuels, fishmeal, ammonium nitrate, calcium hypochloride, scrap, motor blocks and turnings, naptha, Indian coal, mahogany, logs, creosoted goods, ferro silicon, calcium carbide, all hides, direct reduced iron, hot, bricquetted, iron, cement and cement clinker, clinker, sulphur, borax, concentrates, petcoke, pig iron, fuzzy cottonseed (FCS) NPK unless IMO appendix C:
Soyas unless in accordance with IMO requirements for this vessel, fertilizers if discharge is Australia.

Permitted with conditions:

Coal

Charterer to instruct shipper or his agent to provide in writing to the Master, the characteristics of the cargo, and recommended safe handling procedures for its loading and transport, describing as a minimum contract specification for moisture content, sulphur content, size, liability to self heat, or emit methane.  All permitted cargoes to be loaded in accordance with IMO regulations, and full description of cargo features including necessary certificates as required by IMO, to be shown to master prior to commencement of loading.

No consecutive voyages with iron ore/manganese ore, and bauxite ore cargoes to be loaded at maximum 5000 metric tons/hour and subject to decision of Master whether to be loaded in all holds, or alternate holds.

Concentrates

Following conditions to apply:

1)    Charterers/shippers to provide, prior to loading, official evidence that flow moisture point and transportation moisture point are within the limits set by IMO.

**HOWE ROBINSON**

# M.V. SPARTIA
## CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

**Clause 59 continued**

2)  Cargo always to be loaded/stowed/trimmed discharged in accordance with IMO and latest/local regulations.

3)  Any additional trimming of cargo to satisfaction of Master and independent surveyors to be for Charterers time and expense.

## Petcoke

Petcoke to be non-hazardous green delayed, or calcined type and loaded/stowed trimmed/discharged in accordance with IMO and latest/local regulations after discharge, Charterers to arrange at their expense/time any additional cleaning costs, including chemicals, to Master's satisfaction.

Charterers allow to carry maximum one cargo salt per year.

## Salt Clause:

Charterers are permitted to load up to one cargo of bulk salt per annum. Charterers to supply at their time and expense customary substances, including Owners preferred holdblock, and equipment to protect vessel's holds and all necessary cleaning agents/fresh water and equipment as deemed necessary. If required by Charterers, crew to assist application and removal of HB 50, local regulations permitting.

Cargo always to be loaded, stowed and discharged in accordance with all prevailing rules which to include local, national and international as well as all IMO/IMDG Rules, restrictions, regulations and recommendations and always to Master's full satisfaction. Charterers undertake to use as few holds as possible, provided vessel's stability and trim permit.

Steel/steel prods permitted for on voyage within this Charter, P & I pre-loading survey to be held in Charterers time, and cost for Charterers' account.

**Clause 60**

Deleted

**Clause 61        Drydock Clause**

Owners' to have the liberty to dry dock the vessel once during this Charter, except for emergency drydocking. Owners shall give Charterers two months approximate notice for drydocking (intention Far East).

If necessary Charterers will then schedule the vessel for a Far East voyage to meet Owners drydocking schedule as close as possible. Owners and Charterers will cooperate to minimise deviation, and Owners will advise their drydock plans as soon as possible. Any time spent or bunkers consumed during deviation and/or

**HOWE ROBINSON**                    9

M.V. SPARTIA
## CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

### Clause 61 continued

drydocking, shall be for Owners account, with fuel at last purchased price. Until vessel returns to a position no less favourable to Charterers as before going off-hire/starting deviation in relation to vessel's next scheduled employment port. If the vessel returns to a position closer to next scheduled port than the point at which the drydock off-hire commenced, the time at sea saved, and the bunkers saved, shall be credited to the Owners, at the Charter Party rate of hire, and bunker price applicable for the Owners deviation.

Charterers should declare whether they would add the dry docking time into the charter or not latest by January 1st 2005.

Above notice shall not apply in the case of an emergency drydock. This clause not to contribute to the standard 'off hire' clause.

### Clause 62    Stevedore Clause

All stevedore damages to be settled directly between Owners and stevedores, Charterers to be responsible for stevedore damage only when notified in writing by the Master at the time of occurrence of damage or latest within 24 (twenty-four) hours thereafter, Master to co-operate with Charterers and agent on giving prompt notice of claim in writing to party causing same latest before sailing. Upon each occurrence of damage subject that such is practical a joint survey to be held in Charterers' time and for their account, in case Charterers are responsible for such damage, otherwise in Owners' time and for their account, the Master to use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage be made good in the meantime by stevedores otherwise Charterers' are not held responsible.

If above stevedore damages effecting ship's class/ship's worthiness then to be repaired at the port occurrence at Charterers' time/risk and expense.

### Clause 63

Delivery/redelivery to be in local time, but hire to be calculated in GMT.

### Clause 64

Deleted

### Clause 65

Deleted

### Clause 66

Deleted

**HOWE ROBINSON**                    10

# M.V. SPARTIA
## CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

**Clause 67**

Deleted

**Clause 68**

If required, the Charterers use their own Bill(s) of Lading. With reference to Lines 78/79 of the Charter Party, the Charterers and/or their Agents are hereby authorized by the Owners to sign on Owners' behalf all Bill(s) of Lading and presented in accordance with Master's and Tally Clerk's Receipts.

In case original Bills of Lading are not available at discharge port(s), Master/Owners to allow discharge and release the cargo on board against Charterers' single Letter of Indemnity signed by Charterers only with wording as per Owners' Protection and Indemnity Club recommendation.

**Clause 69**

Deleted

**Clause 70**

Owners guarantee vessel holds valid certificate of Financial Responsibility and International Tonnage Certificate and other certificates which may be required at ports of call during the entire Charter Party period.

**Clause 71**    On/Off-Hire Survey Clause

Joint on-hire survey to ascertain the vessel's condition and bunker quantity shall be carried out at the port of delivery in Owners' time if same does not interfere with Charterers' operation.

Joint off-hire survey to ascertain the vessel's condition and bunker quantity shall be carried out at the port of redelivery after completion of discharging in Charterers' time. Only actual time lost to be deducted.

Survey to be carried out by one surveyor acceptable to both parties and cost of survey to be shared equally.

**Clause 72**

The holds on redelivery to be clean swept, but Charterers have the option to redeliver vessel with holds as discharged in lieu of which Charterers to pay lumpsum US$5,500 (Five Thousand Five Hundred Dollars).

**Clause 73**

This Charter Party and any dispute arising hereunder shall be governed by and construed in accordance with English Law both as regards substance and procedure.

**HOWE ROBINSON**

## M.V. SPARTIA
### CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

**Clause 74.**

Charterers to pay Owners lumpsum US$ 1,500 (One Thousand Five Hundred Dollars) per month or pro rata for all cabling, victualling and entertainment.

**Clause 75.**

If under this Charter Party the vessel under-performs as a result of Charterers itinerary, e.g. lengthy delays in port, Charterers shall not claim against the Owners for speed deficiency and or increased bunker consumption.

**Clause 76. — Deleted.**

**Clause 77.**

The vessel to have the liberty of using diesel oil when entering and leaving port and for manoeuvring in shallow and narrow waters.

**Clause 78.**

All cargo claims to be settled in accordance with NYPE Inter-Club Agreement incorporating latest amendments.

**Clause 79**

Charterers have the option to add the off-hired period (including dry docking period) into the Charter.

**Clause 80.**

Any and all taxes and/or dues on cargo and/or freight or Sub-Charter hire to be for Charterers' account. Taxes, if any, on Charter hire levied by the country of vessel's registry and/or her Owners' domicile to be for Owners' account.

**Clause 81.**

The Owners guarantee that the vessel's hatch covers are weather tight. All hatches are to be carefully tendered by the crew to prevent leakage on completion of loading, Owners are to seal the vessel's hatches by Ramnek or similar tape if deemed necessary by Master in Charterers' time for Owners' expenses.

**Clause 82. — Hold Condition:**

The vessel on her arrival first load port shall be fully ready to receive Charterers intended cargo up to grain clean standard with completely clean-swept, washed down by fresh water and dried up holds. On delivery all cargo holds to be in all respects free of salt, loose rust scale and previous cargo residue and should be passed shippers or competent authorities inspection or any inspector including NCB/USDA, in the event of a dispute, the decision of a mutually appointed independent surveyor to be

HOWE ROBINSON

12

## M.V. SPARTIA
## CHARTER PARTY DATED 19TH FEBRUARY 2005
## ADDITIONAL CLAUSES

### Clause 82 continued

binding. Otherwise vessel to be put off-hire from the time of failing until the time of passing re-inspection. And any actual time lost/expenses incurred thereby to be for Owners account.

### Clause 83.

It is expressly agreed that all fumigations due to vessel cannot fulfil the requirements of loading port's authorities/shippers' surveyor to be for Owners time and expenses.

This Clause only to apply when one loaded leg, otherwise fumigations related to previous cargo to be for Charterers' account.

### Clause 84. – Ship to Ship Lightening Clause :

If required, the vessel is to discharge at the floating terminal at a safe anchorage, the operation is to be carried out in safe conditions under the Master's supervision/ approval. The Charterers/receivers to supply sufficient fenders as requested by the Master. The Master is to at all times give full cooperation to the Charterers and/or the Charterers' Agent(s) to expedite discharge, if the Master considers that at any time it is unsafe to commence or to continue discharge, he may remove his Owners' vessel from alongside or vice versa and the time is to count. Such operations always to be carried within customary areas and/or within port limits and, additional premium required if any by Owners' underwriters to be for Charterers' account. Charterers to be responsible for any cost/consequences arising out of any damage to vessel/cargo due above operations.

### Clause 85.

Vessel shall comply with the Local, National and International Regulations regarding water pollution. If any pollution occurs, the time lost and all expenses thus incurred to be for Owners' account even if such pollutions takes place during the vessel's bunkering, but always provided such pollution is the responsibility of the vessel.

However if pollution is caused by Charterers, their agents or servants, to be for Charterers' account. Owners warrant that the vessel is fully covered by P. & I. insurance for pollution liability and will remain so during the currency of the Charter.

### Clause 86.

This fixture to be kept strictly private and confidential.

### Clause 87.

Owners confirm vessel shall be a member of P. & I. Club and her P. & I. Club is a member of the international group of P. & I. Clubs, and Owners guarantee vessel's class is a member of IACS, will remain so throughout the duration of this Charter Party.

### HOWE ROBINSON

# M.V. SPARTIA
## CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

**Clause 88.**

Charterers to pay for Ocean Routes advice to Master in order to maximize vessel's performance, Master will follow suggestions concerning navigation but Master at his reasonable discretion may not follow suggested route in which case he has to detail in the log book the reason for departing same. Should the Master use this discretion unreasonably, the Charterers to have title for claiming eventual under performance.

Evidence of the weather conditions to be taken as reported daily on the noon position report to Charterers, and vessel's logs and weather bureau reports.

All claims relating to performance to be submitted within 6 months of occurrence.

**Clause 89.**

Owners warrant vessel is in all respects eligible for trading to the ports, places specified in this Charter Party and that at all times the vessel and/or Owners shall have valid certificates, records or other documents required for such trade.

Owners guarantee vessel is fully fitted for loading of grain according to SOLAS Regulations.

**BIMCO I.S.M. Clause**

From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel thereafter during the currency of this Charter Party. The Owners shall procure that both the vessel and the 'Company' (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damages, expenses or delay caused by failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for the Owners' account.

**Clause 90.**

Vessel to be free from Asian Gypsy Moth and has not trade Asian Gypsy Moth affected area/CIS Pacific ports in last 24 months.

**Asian Gypsy Moth Clause**

Owners guarantee vessel has not called the CIS Siberian port and Asian Gypsy Moth Area.

**HOWE ROBINSON**

### M.V. SPARTIA
### CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

**Clause 91. – Owners U.S. Trade-Unique Bills of Lading Identifier Clause:**

The Charterers warrant that each transport document accompany a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier required by the U. S. Customs Regulations (19 CRF Part 4 Section 4.7.A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount breach of warranty for the consequences of which the Charterers shall be liable and hold the owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and expenses incurred including fines as a result of the Charterers' breach of the provisions of this clause shall be for the Charterers' account.

**Clause 92.**

Owners confirm vessel is not blacklisted and able to trade to Richards Bay.

**Clause 93.**

Whenever under the terms of this Charter Party, Owners may be responsible for loss of time, costs, expenses and consequences, these being limited to direct, proven and unavoidable expenses. Commercial losses to be expressly excluded.

**Clause 94. – Bunker Quality Clause :**

Fuel and diesel for the vessel will be ordered in accordance with RMG 35 ISO-82-17-1996 (E), and ISO-82-17-1996 (E) DMB for marine distillate fuels.

Owners maintain the right to claim from suppliers for possible substandard fuel, vessel to take samples of the fuel during bunkering either by continuous drip sampling device (if installed), or by regular interval sampling at manifold throughout the whole bunkering period. Any complaints regarding bunker quality must be presented within 30 days after.

Bunkering and documented with DNV analysis based on samples taken as described. This analysis to be final and binding on both parties. Bunker suppliers must be made aware that the vessel is entered in the DNV testing programme each time the Charterers stem bunkers for the vessel.

BIMCO fuel sulphur content clause for time charter parties – notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to meet the maximum sulphur content requirements of any emission control zone when the vessel is trading within that zone.

**HOWE ROBINSON**

## M.V. SPARTIA
### CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

**Clause 94 continued**

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this clause.

For the purpose of this clause, emission control zone shall mean zones as stipulated in marpol annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency

**Clause 95. – Intermediate Hold Cleaning :**

The crew if required by Charterers and permitted by authoritie/local labour, to clean holds between voyages to the best of their ability provided weather conditions permit, but not to be responsible for subsequent approval for loading. If holds are not ready on arrival at load port, vessel to remain on hire continuously whilst crew or shore labour continue cleaning.

For this operation, Charterers to pay Owners with hire USD$700 (Seven Hundred Dollars) per hold for non-dirty cargo, USD$1000 (One Thousand Dollars) per hold for dirty cargo vessel never to be off-hire because of failure to pass hold cleanliness survey after initial acceptance for first cargo under this charter.

Charterers allow to carry maximum one cargo salt per year in which case, Charterers to pay compensation add lumpsum USD $15,000 (Fifteen Thousand Dollars) each beside intermediate hold cleaning if carry salt

**Clause 96. – BMICO ISPS Clause For Time Charter Parties**

(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/ Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master.

**HOWE ROBINSON**

# M.V. SPARTIA
## CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

**Clause 96 continued**

Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision.

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 97.**

Owners warrant that terms of employment of vessels crew is fully in accordance with I.T.F. or an equivalent acceptable to I.T.F. any time lost or expenses incurred in breach of the above to be for Owners' account.

**Clause 98.**

Owners confirm vessel has no deficiencies and that vessel has not been detained by Port State Control in the last 12 months.

**Clause 99. -- Sea Waybills Clause**

The Master shall always sign Bills of Lading/Sea Waybills or authorise the same, as presented without prejudice to this Charter Party. The Charterers shall indemnify the Owners if the Owners are held liable under the Bill of Lading in respect of any claim for which the Owners are not liable towards the Charterers under this Charter Party.

Charterers shall have the option to use Sea Waybill(s) in the format of Genwaybill(s) instead of Bill(s) of Lading, and shall advise Owners which document to be issued under the shipment, not less than 3 (three) days prior to the ETA of the nominated vessel.

HOWE ROBINSON                    7

M.V. SPARTIA
CHARTER PARTY DATED 19TH FEBRUARY 2005
ADDITIONAL CLAUSES

**Clause 99 continued**

The Bill of Lading/Sea Waybill shall be prepared in accordance with the procedure established in the purchase contracts between Charterers and their suppliers.

The Bill of Lading/Sea Waybill shall be endorsed by the Master, agents or Owners, "said to weight", "freight and all conditions as per governing Charter Party". Such Bills of Lading/Sea Waybill shall be signed at Charterers' or shippers' office within 24 (twenty-four) hours after completion of loading. Charterers shall hold Owners harmless should any shortage occur.

In case Sea Waybill(s) are used, Charterers to forward their written instruction as to exact discharge port unless same not already clearly stated, and Charterers don't need to issue kind of Letter of Indemnity. In case Bill(s) of Lading is used, and should the original Bill(s) of Lading not have arrived at discharging port(s) in time, Owners shall release the entire cargo without Charterers presenting original Bill(s) of Lading. Charterers hereby indemnify Owners against all consequences of discharging cargo without presentation of original Bills of Lading. Charterers shall be ready to present single Letter of Indemnity as per Owners' Protection and Indemnity Club wordings with Charterers' signature only to Master or Owners in time.

**Clause 100. - Cargill Split Bill of Lading Clause**

Charterers permitted to use same with major grain houses (Bunge, Dreyfus, Toepfer, Conagra) and others approved by Owners on a case by case basis.

This clause only to apply to Charterers' parcel service SOUTH AMERICA to CONTINENT, where such operation is regularly performed.

Charterers and/or agents are hereby authorised by Owners/Master to split Bills of Lading by issue of ship delivery orders in negotiable and transferable forms in exchange for full set of original Bills of Lading to be collected prior discharge by Owners' agents. If for any reason there is not a full set of original Bills of Lading available when the ship is to be asked to begin discharge, Charterers will in any event provide prior to discharge of any cargo on board a Letter of Indemnity on Owners Protection and Indemnity Club wording covering the whole of the cargo on board. Delivery orders to conform with all terms and condition and exceptions of Bills of Lading and shall not prejudice Shipowner's rights.

The description of the cargo and all other details therein to be in accordance with the original Bills of Lading. The total quantity of cargo covered by all such delivery orders always to equal the total quantity in the original Bills of Lading. The cargo is to be discharged against prior delivery to the Master of all the original delivery orders, failing which Charterers to provide Owners with Letter of Indemnity on Owners' Protection and Indemnity Club wording for the whole cargo on board. Owners to be provided by Charterers prior discharge with copies of all the delivery orders for the cargo. All delivery orders are to be issued stating that the goods to which they relate were originally part of a larger cargo.

**HOWE ROBINSON**                                    8

# M.V. SPARTIA
## CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

## I. BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply :-

### BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## II. GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply :-

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods, shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

**HOWE ROBINSON**

19

## M.V. SPARTIA
## CHARTER PARTY DATED 19TH FEBRUARY 2005
## ADDITIONAL CLAUSES

New Jason Clause continued

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

### BIMCO Standard War Risk Clause for Time Charters, 1993
### Code Name: 'CONWARTIME 1993'

(1) For the purpose of this Clause, the words:

(a) 'Owners' shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b) 'War Risks' shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea); or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only become dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessel of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent right of search and/or confiscation.

(4) (a) The Owners may effect war risks insurance in respect of Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls thereof shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then

HOWE ROBINSON                                    20

## M.V. SPARTIA
### CHARTER PARTY DATED 19TH FEBRUARY 2005
### ADDITIONAL CLAUSES

**BIMCO Clause continued**

such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the order, directions or recommendations of any war risk underwriters who have the authority to give the same under the terms of the war risk insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or anyone or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterer within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**HOWE ROBINSON**

21